UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/15/17__

-------------------------------------------------------------------- X

JAMES R. GOULD, JR., *derivatively on behalf of Bank of America*,

                                      Plaintiff,

                 -against-

BRIAN MOYNIHAN, CHARLES K. GIFFORD, JACK O. BOVENDER, JR., LINDA P. HUDSON, SHARON L. ALLEN, MONICA C. LOZANO, SUSAN S. BIES, THOMAS J. MAY, FRANK P. BRAMBLE, SR., LIONEL L. NOWELL, III, PIERRE J.P. DE WECK, R. DAVID YOST, ARNOLD W. DONALD,

                                    Defendants,

                 -and-

BANK OF AMERICA CORPORATION,

                              Nominal Defendant.

-------------------------------------------------------------------- X

16-CV-7828 (VEC)

MEMORANDUM
OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

     Plaintiff James R. Gould ("Gould"), a Bank of America Corporation ("BofA" or the "Bank") shareholder since 1993, has filed this shareholder derivative complaint ("the Complaint") against BofA's Board of Directors (the "Board" or "Individual Defendants")[1] on behalf of Nominal Defendant BofA.  Gould alleges that the Board violated Section 14(a) of the Securities Exchange Act of 1934, breached its fiduciary duties, and has been unjustly enriched

---

[1]     Defendants Brian Moynihan, Charles Gifford, Jack Bovender, Linda Hudson, Monica Lozano, Thomas May, Frank Bramble, and Arnold Donald served as directors during the relevant time period, and Moynihan served as the Chief Executive Officer ("CEO") since January 2010.  Compl. ¶¶ 21-24, 26, 28-29, 33 (Dkt. 1).  Defendants Sharon Allen, Susan Bies, Lionel Nowell, Pierre de Weck, and David Yost served as directors and members of the Audit Committee during the relevant time period.  Compl. ¶¶ 25, 27, 30-32.

by a scheme to manipulate the foreign currency exchange ("FX") market.  The Board and BofA

move to dismiss Gould's Complaint, and the Court GRANTS the motions.

## BACKGROUND

### A.  The FX Manipulation Scheme and Alleged Misstatements

This lawsuit is one of many that has arisen out of a scheme, participated in by employees

of various major banks, to manipulate the bid-ask spread of FX.  For its FX traders' role in the

scheme, in November 2014, BofA paid $250 million in fines to the Office of the Comptroller of

the Currency ("OCC").  Compl. ¶ 107 (Dkt. 1).  That fine was followed in April 2015 by an $180

million antitrust class action lawsuit settlement,[2] and, in May 2015, by $205 million in fines to

settle with the Federal Reserve.  Compl. ¶¶ 111, 111 n.6.  Investigations into the scheme and the

settlements with regulators were highly publicized.  Compl. ¶ 110.  In its consent order, the

Federal Reserve required BofA to improve its internal controls, finding that its internal controls

were inadequate to enable the Bank to detect and address the misconduct of its FX traders, which

allegedly included communicating with FX traders at other financial institutions in order to fix

FX prices.  Compl. ¶ 112.  Gould alleges that BofA's FX traders' misconduct occurred under the

Board's direction and watch and that the Board caused or allowed the Bank to participate in the

illegal FX antitrust conspiracy.[3]  Compl.  ¶¶ 102, 109.

---

[2]      The settlement was awaiting court approval as of April 2015, Compl. ¶ 111 n.6, and counsel for the Board explained during oral argument that approval remains pending.

[3]      Gould does not allege any specific facts to support his allegation that the Board or senior management participated in or knew of the FX collusion scheme; he offers only conclusory allegations.  *See, e.g.*, Compl. ¶ 64 ("[T]he Individual Defendants . . . colluded to manipulate the WM/Reuters Closing Spot Rates."); ¶¶ 73, 74 ("This activity occurred under the Individual Defendants' direction and on their watch."); ¶ 87 ("The Individual Defendants were part of a conspiracy to manipulate the WM/Reuters Closing Spot Rates . . . ."); ¶ 88 ("The Individual Defendants caused or allowed the fraudulent concealment of the anticompetitive activities, by, among other things, causing or allowed[sic] secret communications in furtherance of the conspiracy."); ¶ 102 ("In addition to causing or allowing the Company to participate in what has been alleged to be an illegal antitrust conspiracy, . . . ."); ¶ 113 ("[A]s a result of the Individual Defendants' breaches, the Company was forced to pay $205 million and adopt enhanced internal controls . . . ."); ¶ 157 ("The Individual Defendants willfully ignored the obvious and pervasive problems being experienced with [BofA's] internal controls practices and procedures . . . .").

Gould also alleges that the Board made false and misleading statements in its 2014 and 2015 proxy statements ("Proxies").[4]  Statements in the Bank's 2014 and 2015 Proxies regarding the resolution of key litigation matters were allegedly false and misleading because the Proxies failed to disclose the Bank's exposure to liability for the FX manipulation scheme, even though reducing the Bank's litigation exposure was a factor in determining executive compensation. Compl. ¶¶ 117-121, 124, 128, 130.  The misleading statements were purportedly especially egregious because the Proxy included a "say-on-pay" vote, allowing shareholders to vote on executive compensation.  Compl. ¶¶ 121, 131.  In other words, the Bank's pitch to shareholders made via the Proxies to approve executive compensation was allegedly misleading because it omitted information pertinent to one of the factors the Bank was using to determine executive compensation.  According to Gould, the Board knew or should have known of these misstatements because it drafted, approved, reviewed, or signed the Proxies and because the government investigations of the Bank for FX manipulation were public.  Compl. ¶¶ 114, 120, 123.  Moreover, by the time of the 2015 Proxy, the Board knew the Bank had paid $250 million to settle the OCC investigation.  Compl. ¶ 128.

## B.  Gould's Demand on the Board to Take Action and the Board's Response

On June 13, 2015, Gould demanded (the "Demand") that the Board conduct an independent investigation into and commence a civil action against certain current and former directors and executive officers.  Compl. ¶ 133; Compl. Ex. A, at 12 (Dkt. 1-1).  The Demand alleged that the Board had violated various state and federal laws by: (1) failing to manage and oversee the Bank's FX business; (2) failing "to establish and maintain adequate internal controls;

---

[4]        Gould's Complaint also includes allegations that various SEC filings included false and misleading statements.  Compl. ¶¶ 102-104.  Gould does not include those alleged misstatements in his Section 14(a) claim, *see* Compl. ¶¶ 170-177, but appears to include them in his breach of fiduciary duty claim, *see* Compl. ¶¶ 158-159.

and (3) disseminating allegedly "false, misleading, and/or incomplete information" to shareholders.  Compl. Ex. A, at 11-12.

On July 28, 2015, BofA's Associate General Counsel and Assistant Secretary, Gale Chang ("Chang"), informed Gould that the Board had "authorized the Audit Committee to consider the Demand, undertake such steps as it determines to be advisable, and make recommendations to the Board."  Compl. ¶ 134; Compl. Ex. B (Dkt. 1-2).  On September 24, 2015, the Audit Committee met with in-house counsel to discuss the Demand, and it identified numerous reasons why it should not investigate the Demand's allegations.  Compl. ¶ 146.  One of the Audit Committee's reasons not to investigate was that the Bank's counsel had previously reviewed "substantial materials, including certain Board level materials from 2007-2014," relevant to Gould's Demand, and counsel had not found any evidence that the Bank's senior management or the Board were complicit in or aware of the FX misconduct.  Compl. ¶ 147. Another reason was that an investigation into the Demand's allegations could have a "potential adverse effect" on the Bank's defenses and strategies in pending governmental investigations, regulatory actions, and civil litigation.  Compl. ¶ 148.  The Audit Committee decided that it would "continue to monitor the ongoing litigation and governmental investigations and regulatory actions relating to the same and/or related matters that are the subjects of the Demand" but "simultaneously resolved to not pursue such claims or take such actions at this time."  Compl. ¶ 149.  The Audit Committee recommended to the Board that it decline the Demand in light of the Audit Committee's determination that investigating the Demand's claims was "not in the best interests" of BofA.  Compl. ¶ 150.

On October 22, 2015, the Board met to consider the Demand and adopted the Audit Committee's recommendation.  Compl. ¶¶ 136, 150.  On October 30, 2015, Chang informed Gould that the Board had formally refused the Demand.  Compl. ¶ 136.  Chang explained that

"the Board considered the Demand and determined in its business judgment, based on the recommendation of the Audit Committee, that it is not in the Corporation's best interests to pursue the claims outlined in the Demand or to undertake any new investigation."  Compl. ¶ 136; Compl. Ex. C, at 1 (Dkt. 1-3).

Chang explained that the Board took into account the following when deciding to refuse the Demand: (1) "the substantive difficulties in proving the Demand's proposed claims of purported mismanagement by the Board and the Corporation's executive officers;" (2) in the course of responding to regulatory inquiries, the Bank and its advisers had not identified any information suggesting the Board or senior management were complicit in or aware of the alleged misconduct, and the Demand alleged no facts indicating to the contrary; (3) the Bank's disclosures included warnings about compliance risk and the possibility of harm from employee misconduct; (4) the low likelihood of obtaining meaningful monetary recovery from the putative defendants because the Bank's certificate of incorporation exculpates the directors from liability to the Bank, except for acts or omissions made intentionally in violation of the law or not in good faith; and (5) undertaking a new investigation or pursuing claims could undermine the Bank's legal defenses and strategies and could negatively affect a proposed settlement in a civil matter pending court approval.  Compl. Ex. C, at 1-2.  The letter emphasized that the Demand had not included any facts that would justify the cost and disruption of investigating further and that the Demand had failed to provide "any reason to expect that the Corporation has, or could potentially develop, grounds for recovery against any particular individual director or executive officer . . . ."  Compl. Ex. C., at 2.

Dissatisfied with that response, Gould sent another letter to Chang, this one seeking to "obtain clarification and insight" regarding the refusal and the Board's and Audit Committee's investigation.  Compl. ¶ 139; Compl. Ex. D (Dkt. 1-4).  Gould requested copies of all documents

reviewed in connection with the Board's consideration of the Demand, a list of all witnesses interviewed during the investigation into the Demand's allegations, and a list of all factors not specifically provided as a basis for the refusal. Compl. ¶ 140; Compl. Ex. D. After the Board and Gould entered into a confidentiality agreement, on February 5, 2016, Gould was provided with a redacted document production that included Board's and Audit Committee's meeting minutes. Compl. ¶¶ 141-150.

Gould takes issue with the Board's handling of his Demand. He criticizes the Board and the Audit Committee for failing to investigate any of the Demand's allegations. Compl. ¶¶ 138, 144-146. In addition, he alleges that the Board's response to the Demand was unfounded, essentially because the Bank had been required to pay large fines and because the Federal Reserve had concluded that the Bank lacked adequate firm-wide governance and compliance policies and procedures. Compl. ¶ 147. Gould also maintains that the Audit Committee was not a "suitable investigatory committee" because every member of the Audit Committee had served as director during some period of the wrongdoing alleged in the Demand (which was also true of the Board) and because the Audit Committee oversaw and reviewed the Bank's legal and regulatory compliance, the adequacy of which was at the heart of the Demand's allegations. Compl. ¶ 152. Finally, Gould found the Board's response lacking because neither the Audit Committee nor the Board prepared a formal report detailing their conclusions. Compl. ¶ 153. In sum, Gould alleges that the Board improperly prejudged the merits of the Demand's allegations, that the Board's process was procedurally deficient and inadequately diligent, and that the Board unreasonably and in bad faith abdicated its duties in responding to the Demand. Compl. ¶ 154.

## C. Procedural History

On April 28, 2016, Gould filed a derivative complaint in New York State Supreme Court, alleging breach of fiduciary duty and unjust enrichment. BAC Mem. 6; Board Mem. 5.[5] On September 16, 2016, the parties stipulated to dismiss that action in order to permit Gould to file a new lawsuit in federal court asserting an additional claim under Section 14(a) of the Securities Exchange Act. BAC Mem. 7; Board Mem. 5. The stipulation was approved on September 27, 2016, BAC Mem. 7; Board Mem. 5, and on October 6, 2016, Gould filed this lawsuit. Dkt. 1.

Gould alleges three claims in his Complaint. First, he claims the Board breached its fiduciary duty to ensure that the Bank operated lawfully because it willfully or recklessly ignored "the obvious and pervasive problems" caused by the Bank's internal control practices and failed to make a good faith effort to correct those problems, ultimately resulting in regulatory enforcement and civil litigation. Compl. ¶¶ 156-157, 161-163. The Board also allegedly breached its fiduciary duty to ensure that the Bank disseminated accurate and complete information to its shareholders by allowing the Bank to include materially misleading information in its SEC filings and proxy statements. Compl. ¶¶ 158-160. Second, Gould claims the Board was unjustly enriched by its compensation. Compl. ¶¶ 167-168. Lastly, Gould claims the Board violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9, 17 C.F.R. § 240.14a-9, because it knew or should have known that the Bank included false and misleading statements in its 2014 and 2015 Proxies. Compl. ¶¶ 170-177.

---

[5] The Court cites to the parties' briefing as the following: Memorandum of Law in Support of Nominal Defendant Bank of America Corporation's Motion to Dismiss (Dkt. 15) is "BAC Mem."; Memorandum of Law in Support of Individual Defendants' Motion to Dismiss (Dkt. 18) is "Board Mem."; Plaintiff's Combined Memorandum in Opposition (Dkt. 22) is "Pl. Opp."; Reply Memorandum of Law of Bank of America Corporation in Further Support of Its Motion to Dismiss (Dkt. 23) is "BAC Reply"; and Reply Memorandum of Law in Support of Individual Defendants' Motion to Dismiss (Dkt. 24) is "Board Reply."

The Board and BofA have moved separately to dismiss these claims pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure.  Dkts. 14, 17.  BofA argues that the Court should dismiss Gould's Complaint because Gould has failed to allege with particularity that the Board wrongfully refused his Demand, as required by Delaware law in order to bring a shareholder derivative action.  In addition, the Board argues not only that Gould's Section 14(a) claim is time-barred but also that Gould has failed to allege that the statements in BofA's Proxies were false or misleading, that any alleged omissions were material, or that the purported misstatements or omissions caused harm to BofA.  Lastly, the Board argues that Gould has failed to state a claim for breach of fiduciary duty or for unjust enrichment.

## DISCUSSION

### I.  Gould Has Not Satisfied the Heightened Pleading Standard for a Shareholder Derivate Suit

#### A.  Applicable Legal Standard

Rule 23.1 of the Federal Rules of Civil Procedure imposes a heightened pleading standard for shareholder derivative suits.  Pursuant to Rule 23.1, a complaint seeking to allege a shareholder derivate action must:

> state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b)(3).  The pleading requirements under Rule 23.1 are "atypically rigorous." *In re SAIC Inc. Derivative Litig.*, 948 F. Supp. 2d 366, 384 (S.D.N.Y. 2013), *aff'd sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014); *see also Fink v. Weill*, No. 02 CIV. 10250 (LTS) (RLE), 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005) ("[Rule 23.1] imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." (citing *In re Trump Hotels S'holder Derivative Litig.,* Nos. 96

Civ. 7820 (DAB), 96 Civ. 8527 (DAB), 2000 WL 1371317, at *6 (S.D.N.Y. Sept. 21, 2000))).[6]

"When considering a motion to dismiss for failure to satisfy Rule 23.1's particularity requirement, the Court accepts as true all well-pleaded allegations and all reasonable inferences drawn therefrom." *In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006) (citing *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 430 (S.D.N.Y. 2005)).

"The adequacy of a complaint alleging wrongful refusal of a stockholder demand is determined under the law of the state of incorporation . . . ." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 807 F.3d 502, 505 (2d Cir. 2015). Under Delaware law, which the parties agree applies, whether a plaintiff has adequately alleged a wrongful refusal "starts from the premise that the decision to initiate a lawsuit is an internal corporate matter within the board's discretion." *Id.* Thus, "[b]y its very nature the derivative action impinges on the managerial freedom of directors." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

A shareholder can only bring a derivative action if he or she alleges with particularity that either: (1) he or she made a demand on the board of directors to initiate litigation and was wrongfully refused, or (2) a demand is excused as futile in light of the directors' inability to decide impartially whether to initiate the litigation. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006). Because Gould submitted the Demand to the Board, the only issue here is whether Gould has alleged with adequate particularity that the Board wrongfully refused the Demand. Moreover, having made the Demand on the Board, Gould conceded that a majority of the Board was independent for the purpose of responding to the

---

[6]     The same principles underlie Federal Rule of Civil Procedure 23.1 and Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware, and cases interpreting both standards have been held to be equally applicable in federal court. *In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.*, 773 F. Supp. 2d 330, 347 n.17 (S.D.N.Y. 2011), *aff'd sub nom. Lambrecht v. O'Neal*, 504 F. App'x 23 (2d Cir. 2012).

Demand. *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990) ("By electing to make a demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to respond.").

In order to allege successfully that a board of directors wrongfully refused a shareholder's demand, the shareholder-plaintiff must overcome the business judgment rule. "The business judgment rule presumes that the board made its decision 'on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Merrill Lynch*, 773 F. Supp. 2d at 345 (quoting *Spiegel*, 571 A.2d at 774). To overcome this presumption, the plaintiff must plead "sufficient facts to suggest that the board's decision was unreasonable or not made in good faith, in the context of all of the factors that the board had to consider." *Espinoza*, 807 F.3d at 505; *see also Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 74 (Del. 1997) ("[T]he board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is entitled to the benefit of the presumption."), *as modified on denial of reh'g* (Oct. 22, 1997) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). To determine whether a board acted unreasonably or not in good faith when refusing a demand, courts apply a gross negligence standard, "defined under Delaware law as 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'" *Espinoza*, 807 F.3d at 506 (quoting *McPadden v. Sidhu,* 964 A.2d 1262, 1274 (Del. Ch. 2008)). "[F]ew, if any, plaintiffs surmount this obstacle." *In re Merrill Lynch*, 773 F. Supp. 2d at 345 (citing *RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1328 (2d Cir. 1991)).

### B. Gould Has Not Alleged Wrongful Refusal with Adequate Particularly

Gould argues that his allegations overcome the presumption created by the business judgment rule because: (1) the Board did not commence a new investigation in response to the

Demand; (2) the Board's refusal is based on an "inexplicable" conclusion; and (3) the Board's process for addressing the Demand was deficient. Pl. Opp. 15-24. The Court agrees with the Board that Gould has not rebutted "the strong presumption that the [B]oard's decision not to take action was a valid exercise of its business judgment." *Espinoza*, 807 F.3d at 505 (internal quotation marks and citation omitted).

      1.  <u>Gould Fails to Allege that the Board Was Uninformed</u>

Gould argues that the Board's refusal was unreasonable and made in bad faith because neither it nor the Audit Committee conducted a substantive investigation into the Demand prior to refusing it. Pl. Opp. 15-18. According to Gould, failure to investigate a demand automatically indicates that the Board acted in bad faith. *Id.* at 14, 15, 18. Gould dismisses the Board's explanation that it had already considered the issues raised in the Demand and the relevant evidence in the course of responding to regulatory investigations and civil lawsuits as an inadequate "excuse." *Id.* at 15. In drawing on its prior knowledge and experience, the Board purportedly shirked its responsibility to investigate the Demand because the allegations in the Demand were more expansive than the allegations at issue in the prior investigations and lawsuits. *See id.*

Delaware law does not require a board to conduct a substantive, formal investigation into a demand's allegations. There is "no prescribed procedure a board must follow" when evaluating a demand; instead, Courts look to whether the board of directors has fulfilled its "duty to act on an informed basis." *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The three cases relied on by Gould to support his argument that the Board was required to conduct a substantive investigation do not hold otherwise. In *Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985), the court stated that "[u]pon receipt of a

demand, the Board of Directors must investigate and evaluate the charges in order to discharge its duty to the shareholders," 604 F. Supp. at 1117, but the court did not specify how the directors were required to investigate or evaluate the claims in the demand in order to act reasonably and in good faith. In *Barovic v. Ballmer*, 72 F. Supp. 3d 1210 (W.D. Wash. 2014), the court held that the plaintiff had adequately alleged that the board's investigation was so "restricted in scope, shallow in execution, *pro forma*, and half-hearted" to be grossly negligent, 72 F. Supp. 3d at 1217 (citation and internal quotation marks omitted), but the court also noted that "there is no universal 'prescribed procedure that a board must follow' in assessing shareholder demands," *id.* at 1215 (citing *Levine*, 591 A.2d at 214). In *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.*, 273 N.Y.S.2d 16 (Sup. Ct. 1966), the court held, applying New York law, that the board wrongfully refused the demand because the board not only failed to investigate but "did nothing."[7] 273 N.Y.S.2d at 25. Clearly, whether and to what extent a board of directors investigates the allegations in a demand is a factor for courts to consider in determining whether a board of directors acted reasonably and in good faith, but ultimately the question is whether the board acted on an informed basis.

Based on Gould's allegations in the Complaint, the Board was adequately informed when it refused the Demand. For nearly two years prior to Gould's Demand, BofA—with oversight from the Board—had been responding to significant regulatory investigations and civil lawsuits regarding the scheme to manipulate FX. *See* Compl. ¶¶ 105-107, 109-111. The Board explained clearly when it refused the Demand that it was drawing on its prior knowledge, stating that "in the course of responding to regulatory inquiries into the foreign exchange practices of the

---

[7]     *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963 (Del. Ch. 2013), cited by Gould, also held that the shareholder-plaintiff had adequately alleged a bad faith refusal because the board did nothing in response to the demand. In that case, the independent directors tasked with investigating the demand resigned, the investigation was defunded, and the board never responded to the demand. 66 A.3d at 969-70, 971-73, 979. Not surprisingly, the court concluded that the board responded in bad faith. *Id.* at 979.

Corporation's affiliates, the Corporation and its advisors have not identified any information to the Board which would suggest that the Board or senior management were complicit in any wrongdoing or made aware of any alleged misconduct." Compl. Ex. C, at 1; *see also Merrill Lynch*, 773 F. Supp. at 349 (holding the board refused the demand on an informed basis in part because it "was already quite familiar with the allegations in plaintiff's letters from its consideration of the various other proceedings referred to in the letters"); *Mount Moriah Cemetery on Behalf of Dun & Bradstreet Corp. v. Moritz*, No. CIV.A.11431, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991) (unpublished opinion) (board was adequately informed in part because issues raised in the demand letters were well known to the board given two class actions, numerous individual suits, and widespread media attention regarding the issues raised in the demand letters), *aff'd*, 599 A.2d 413 (Del. 1991).

The BofA's Board did not "do nothing" in order to educate itself to respond to the Demand—it referred the Demand to the Audit Committee, considered the Audit Committee's recommendation and reasoning with the assistance of counsel, and drew on its existing knowledge developed in the course of responding to related allegations. *Cf. Levine*, 591 A.2d at 214 (Plaintiff's allegations that the board did not undertake an investigation and did nothing were conclusory and contrary to the board's letter refusing the demand, which stated that the board made its decision "following the review of the matters set forth in your [demand] letter."); *Merrill Lynch*, 773 F. Supp. 2d at 347-78 (dismissing shareholder's derivative claim because the refusal letter contradicted plaintiff's conclusory allegation that the board undertook no investigation of her claims). Other courts have held this level of review to be reasonable. *See, e.g.*, *Levine,* 591 A.2d at 199, 213-15 (finding the investigation reasonable even though the board rejected the demand after one meeting); *Merrill Lynch*, 773 F. Supp. 2d at 345-49 (an investigation that consisted of one board meeting was reasonable); *Baron v. Siff,* No. 15152,

1997 WL 666973, at *3 (Del. Ch. Oct. 17, 1997) (unpublished opinion) (holding that issuance of refusal letter nine days after the demand was made was insufficient to rebut the presumption of the business judgment rule because the board's "detailed responses" to the demand's allegations revealed the board's "familiarity with the issues").

Gould's Demand did not disclose any new facts that might have suggested that the Bank's previous investigations had overlooked evidence implicating the Board or senior management in any of the alleged misconduct, and the Board noted that absence as an additional reason for its refusal. Compl. Ex. C, at 1 ("[T]he Demand letter fails to come forward with any information that would suggest misconduct by, or a basis for recovery from, any individual director or executive officer of the Corporation or its affiliates."). Without such allegations, the Board reasonably relied on the Audit Committee's recommendation and its existing knowledge developed over several years of responding to significant government investigations and civil litigation.

In sum, accepting as true the Complaint's well-pleaded allegations and drawing all reasonable inferences in favor of Gould, given the Board's explicit—and reasonable—reliance on its existing knowledge and given its consideration of the Audit Committee's recommendation, Gould has failed to allege that the Board was uninformed to the point of reckless indifference or beyond the bounds of reason when it refused his Demand.

2. <u>Gould Fails to Allege that the Board Acted in Bad Faith</u>

Gould argues that the Board's refusal was "inexplicable" and thus made in bad faith. Pl. Opp. 18-20. Specifically, Gould argues that the Board's determination that it was not aware of any information suggesting that the Board or senior management were complicit in or aware of wrongdoing was inexplicable in light of the Federal Reserve's conclusion in its consent order

that BofA "lacked adequate firm-wide governance, risk management, compliance, and audit policies and procedures." *Id.* at 19-20.

Even if Gould were correct on that single point (and for the reasons discussed below, he is not), as BofA points out, the fact that the Board had found no evidence of Board or senior management complicity in the alleged FX scheme was not the only reason the Board rejected the Demand. BAC Reply 6. The Board provided the following additional reasons: "the substantive difficulties in proving the Demand's proposed claims"; the fact that the Bank's disclosures included warnings about compliance risk and the possibility of harm due to employee misconduct; the low likelihood of obtaining meaningful monetary recovery from the putative defendants; and the fact that undertaking a new investigation or pursuing claims could undermine the Bank's legal defenses and strategies, including a pending settlement. Compl. Ex. C, at 1-2. Courts have found reasons such as these to fall well within a board's valid business judgment. *See, e.g.*, *Espinoza*, 807 F.3d at 507 (affirming dismissal when the board, after evaluating the claims against the potential defendants and the likelihood of recovery of damages, determined that litigation would not be in the best interests of the company); *Lambrecht v. O'Neal*, 504 F. App'x 23, 27-28 (2d Cir. 2012) (summary order) (plaintiff failed to allege that the board acted in bad faith or conducted an unreasonable investigation inasmuch as the board concluded that pursuing the demand was not in the company's best interest because of the possible compromise of pending litigation and government investigations, the low probability of recovery from the former directors and officers, and the difficulty of prevailing on a failure of oversight claim under Delaware law). Gould does not argue that those additional reasons for refusing his Demand were inexplicable, but those reasons alone suggest that the Board acted neither recklessly nor outside the bounds of reason when refusing the Demand.

The Court also agrees with BofA that the Board's reliance on its prior investigations that found no evidence of Board or senior management complicity was "far from inexplicable." BAC Reply 7. Although Plaintiff contends that this is a case of "where there's smoke there's fire," nothing in the Complaint suggests that the misconduct—or knowledge of it—reached the most senior levels of the Bank. On the contrary, according to the Audit Committee, BofA's counsel did not identify any evidence of wrongdoing or awareness of misconduct by the Board when it previously reviewed "substantial materials, including certain Board level materials from 2007-2014." Compl. ¶ 147. In addition, the consent orders from the Federal Reserve and OCC indicated that the alleged wrongdoing was committed by "traders," not board members or senior management. Compl. ¶¶ 108, 112. As mentioned above, Gould's Demand did not provide any additional information or allegations that would have supported the notion that the Board or senior management was involved in or aware of the FX collusion. That the Federal Reserve concluded in its consent order that BofA "lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures to ensure that the firm's Covered FX Activities complied with safe and sound banking practices, applicable U.S. laws and regulations, including policies and procedures to prevent potential violations of the U.S. commodities, antitrust and criminal fraud laws, and applicable internal policies,"[8] Compl. ¶ 112, does not compel the conclusion—in the absence of any other information or allegations—that the Board

---

[8]     The Complaint and Gould's arguments consistently truncate the finding to make it appear that the Federal Reserve found that BofA wholly lacked adequate internal controls, on a bank-wide basis. In fact, the Federal Reserve's critique of BofA's internal controls and governance focused entirely on its FX business, the very business that had been subject to years of investigations. *See* Written Agreement Between Bank of America and Board of Governors of the Federal Reserve System, Docket No. 15-010-B-HC, 15-010-CMP-HC (May 20, 2015), https://www.federalreserve.gov/newsevents/pressreleases/enforcement2015052 0a.htm.

or senior management must have been complicit in or aware of the alleged FX collusion and that the Board was thus reckless in refusing to investigate further their involvement.[9]

Gould also argues that the Board acted in bad faith because its process for evaluating the Demand was "fatally flawed." Pl. Opp. 20-24. First, Gould argues the process was fatally flawed because neither the Board nor Audit Committee created any formal report detailing their conclusions but instead prepared only an eight-page slideshow. *Id.* at 20-22. Gould contends that, given the lack of a report and the "perfunctory" slideshow, the Board has concealed its reasons for refusing the Demand and has made it impossible to discern whether the Board earnestly considered the Demand. *Id.* But, as explained above—and as Gould concedes—there is no prescribed procedure a board must follow when reviewing a shareholder demand. *Levine*, 591 A.2d at 214; *see also Gatz v. Ponsoldt*, No. CIV.A. 174-N, 2004 WL 3029868, at *5 (Del. Ch. Nov. 5, 2004) (unpublished opinion) ("[T]here is no authority that suggests that Delaware law requires a formal 'report' as a matter of law . . . ."). The facts as alleged indicate that the Board earnestly considered the Demand—it referred the matter to the Audit Committee, which met with in-house counsel to evaluate the substance of the Demand and took into account the Bank's knowledge gained from prior investigations on the same issue, Compl. ¶¶ 146-151; it reviewed and adopted the Audit Committee's recommendation,[10] Compl. ¶ 150; and it provided

---

[9]    The case on which Gould relies in support of his argument that the Board's refusal was inexplicable is distinguishable. In *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022 (N.D. Cal. 2013), the district court held that the shareholder-plaintiff adequately alleged that the board's demand refusal was unreasonable and in bad faith because the board's explanation that it had engaged in no wrongdoing was contradicted by the company's acceptance of responsibility for wrongdoing in a non-prosecution agreement. 970 F. Supp. 2d at 1031-32. Here, in contrast, there are no admissions or findings that the Board or senior management knew about the FX collusion.

[10]   Gould emphasized during oral argument that neither he nor the Court can truly evaluate whether the Board refused his Demand reasonably and in good faith because neither he nor the Court knows what information the Board considered when assessing the Demand as the Board has not produced (non-redacted) information showing what specifically the Bank previously investigated in response to civil litigation and regulatory inquiries. But in making this point, Gould appears to reverse the applicable legal standard. It is Gould who has the burden to allege with particularity that the Board refused his Demand unreasonably and in bad faith; it is not the Defendants' burden,

Gould with a non-conclusory refusal, detailing its reasons for refusing, Compl. ¶ 136; Compl. Ex. C. Although Gould might want the Board to have done more, he has not alleged any facts that would permit the Court to conclude that the Board's investigation was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham" and thus signal bad faith.[11] *Stoner v. Walsh*, 772 F. Supp. 790, 799 (S.D.N.Y. 1991) (quoting *Auerbach v. Bennett,* 47 N.Y.2d 619, 634–35 (1979)).[12]

Second, Gould argues the Board's process was fatally flawed because the Audit Committee was conflicted. Pl. Opp. 22-24. The Audit Committee's members were responsible

---

at this stage, to show that the Board acted reasonably and in good faith because the Board's valid business judgment is presumed. As explained above, Gould has not alleged any facts with particularity to create reasonable doubt as to whether the Board should be entitled to a presumption of valid business judgment. *See Scattered Corp.*, 701 A.2d at 74.

[11] Gould again relies on *Page*, this time to argue that the lack of a formal report and investigation must signal bad faith because *Page* held that the plaintiff had "raised a reasonable doubt that the investigation of its demand was conducted reasonably and in good faith" even though, in that case, the board had appointed an independent committee represented by independent counsel to conduct an investigation, and the investigation resulted in a 149-page report. Pl. Opp. 21 (citing *Page*, 970 F. Supp. 2d at 1029). As explained *supra* in note 9, there were other facts in *Page* that are not present here: the company's acceptance of responsibility for wrongdoing in a non-prosecution agreement contradicted the board's determination in its refusal letter that it had found no wrongdoing or culpability by the company's directors or officers; and neither the court nor the plaintiff could assess why that contradiction existed because the report was not provided to the plaintiff or the court for review. *Page*, 790 F. Supp. 2d at 1031-32 (distinguishing *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70 (Del. 1997), which held that the plaintiff had inadequately pled bad faith in part because the committee found the demand's claims were unsubstantiated). Gould has proffered no information to contradict the Board's conclusion that there is no evidence that senior management or the directors were complicit in or aware of the FX collusion, as discussed above.

Similarly, in *Brosz v. Fishman*, No. 1:13-CV-753, 2016 WL 7494883 (S.D. Ohio Dec. 29, 2016), on which Gould also relies, in response to the plaintiff's allegation that the individual defendants had engaged in a scheme to inflate their employer's share price while selling large numbers of shares, the board conceded that the individual defendants sold their stock but concluded that they had not breached any fiduciary duties. 2016 WL 7494883, at *1. The district court held that the board's "conclusory statement" that the individual defendants had not breached their fiduciary duties raised reasonable doubt about the board's business judgment in light of the admission that the individual defendants sold shares. *Id.* at *5. Here, there is no admission—or factual finding—that contradicts the Board's conclusion, based on counsel's previous review of materials, that no evidence implicated senior management or the Board in misconduct.

[12] The Court cites New York law to address Gould's attempt to apply this New York law standard to the allegations at bar via his reliance on *Barovic v. Ballmer*, 72 F. Supp. 3d 1210 (W.D. Wash. 2014), mentioned above. Delaware law does not appear to include an identical articulation of the standard found in *Barovic* and *Stoner* for determining whether an investigation is reasonable and conducted in good faith, but this articulation of New York law is not inconsistent with Delaware law.

for overseeing the Bank's compliance, and the Bank's compliance failures were the subject of Gould's Demand. *Id.* at 23. Although it is true that a shareholder-plaintiff concedes a board's independence when he or she submits a demand to the board, that is only a concession *ex ante*— a plaintiff-shareholder may still allege that the board failed to act independently *ex post* in response to the demand. *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see also Scattered Corp.*, 701 A.2d at 74-75. Gould contends that the Audit Committee was not independent because its members faced potential liability pursuant to the Demand's allegations. That, however, is not an allegation that the Audit Committee failed to act independently *ex post* in responding to the Demand; that is a fact that existed *ex ante* to Gould's Demand, and it is an argument that courts have rejected. *See, e.g.*, *Halpert Enters., Inc. v. Harrison*, No. 06 CIV. 2331 (HB), 2007 WL 486561, at *6 (S.D.N.Y. Feb. 14, 2007) (the allegation that the audit committee lacked independence because its members faced possible personal liability if the demand's allegations were true was insufficient standing alone to challenge the audit committee's independence), *aff'd*, No. 07-1144-CV, 2008 WL 4585466 (2d Cir. Oct. 15, 2008).

For all these reasons, Gould has not satisfied the heightened pleading standard to bring a shareholder derivative action, and Gould's Complaint is dismissed. Even if Gould had satisfied the heightened standard, for the reasons discussed below, his Section 14(a) claim would fail, and the Court would decline to exercise supplemental jurisdiction over Gould's remaining state law claims.

## II. Gould Has Failed to Allege a Plausible Section 14(a) Claim

### A. Applicable Legal Standard

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor. *See*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although all factual allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.  Gould's Section 14(a) Claim Is Time-Barred

Claims brought "pursuant to Section 14(a) must be brought within one year of the discovery of the [alleged] violation, and in no event more than three years from the issuance of the proxy statement at issue." *Take-Two Interactive Software, Inc. v. Brant*, No. 06CIV05279 (LTS), 2010 WL 1257351, at *5 (S.D.N.Y. Mar. 31, 2010); *see also Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (summary order) (applying one year statute of limitations to Section 14(a) claim). Gould alleges that the Individual Defendants violated Section 14(a) because the Bank's 2014 and 2015 Proxies failed to discuss the Bank's legal exposures with respect to the FX market. Compl. ¶¶ 117-121, 124, 128, 130-131. There is no dispute that Gould filed this Complaint more than one year after the discovery of the alleged material misstatements in the 2014 and 2015 Proxies. On June 13, 2015, Gould submitted his Demand to the Board, which cited public information regarding BofA's legal exposure with respect to the FX market. Compl. Ex A. Therefore, by at least June 13, 2015, Gould was aware of the alleged material misstatements. Gould filed this Complaint on October 6, 2016, more than one year after submitting his Demand. Dkt. 1.

The parties dispute whether the statute of limitations is tolled by a shareholder demand. *See* Pl. Opp. 34-35; Board Reply 2. The Court need not resolve that dispute,[13] however, because Gould's Section 14(a) claim is time-barred even if his Demand tolled the statute of limitations. Gould necessarily knew or should have known as of March 2015 that the 2014 and 2015 Proxies failed to disclose BofA's legal exposure in connection with misconduct in the FX market because on March 26, 2015, the same day the Bank issued its 2015 Proxy, the Bank released its 2014 annual report, which discussed the OCC settlement, the Bank's "advanced discussions" to resolve another regulatory inquiry into its FX activities (the Federal Reserve inquiry), and the ongoing related antitrust litigation. *See* Burnovski Decl. Ex. C, at 216 (Dkt. 19).[14] Accordingly, the statute of limitations began to run on March 26, 2015,[15] and ran until Gould submitted his Demand on June 13, 2015, seventy-nine days later. The Court will assume the statute of limitations was tolled as of that date. As of October 30, 2015, when the Board refused Gould's Demand, Gould had 286 days remaining to file his Section 14(a) claim—i.e., until August 11,

---

[13]     Neither party cites any case law addressing specifically whether a shareholder demand tolls the statute of limitations for a Section 14(a) claim.

[14]     "[T]he Court may take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission . . . documents that both bear on the adequacy of SEC disclosures and are public disclosure documents required by law . . . ." *Pehlivanian v. China Gerui Advanced Materials Grp.*, Ltd., 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Accordingly, this Court may take judicial notice of the annual report . . . ." *Id.*

[15]     At oral argument, Gould argued that the statute of limitations did not begin to run until May 20, 2015, when the Federal Reserve issued the consent order criticizing aspects of the Bank's governance and internal controls. As the Board explained at oral argument, however, the statute of limitations began to run before the Federal Reserve issued its consent order because the *fact* that the Bank faced significant legal liability for its FX business—which is the *fact* that Gould claims was omitted from the 2014 and 2015 Proxies—was public before the Federal Reserve issued its order. The OCC settlement, the ongoing related antitrust litigation, and the fact that the Bank was in "advanced discussions" to resolve another regulatory inquiry into its FX activities (the Federal Reserve inquiry) were all made public by March 26, 2015—if not before—as explained above.

2016.  Gould did not file his Section 14(a) claim until October 6, 2016, almost two months after

the statute of limitations had expired.[16]

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED, and Gould's

Complaint is dismissed with prejudice.  The Court does not grant Gould leave to amend because

Gould has not indicated that he is aware of other facts that would rebut the presumption of the

Board's valid business judgment in refusing his Demand.  Moreover, even if Gould could allege

such facts, his Section 14(a) claim would be dismissed as time-barred, and this Court would

decline to exercise supplemental jurisdiction over Gould's remaining state law claims.  The

Clerk of Court is respectfully directed to terminate the open motions at docket entries 14 and 17

and to close the case.

**SO ORDERED.**

Date:  **August 15, 2017**
       **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[16]      Gould's lawsuit filed in New York Supreme Court on April 28, 2016, does not save his Section 14(a)
claim.  The parties voluntarily agreed to dismiss that case so that Gould could add a Section 14(a) claim and file suit
in federal court, *see* BAC Mem. 7; Board Mem. 5, indicating that Gould had not included a Section 14(a) claim in
his state court complaint.  Regardless, newly filed claims in federal court do not "relate back" to claims filed earlier
in state court.  *Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 225-26 (S.D.N.Y. 2016) (explaining that the relation
back rule "does not permit a party to voluntarily withdraw one lawsuit and file another against the same parties in a
different venue while tolling the statute of limitations").